AO-106 (Rev. 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*FILED*
*SEP 18 2025*
*Heidi D. Campbell, Clerk*
*U.S. DISTRICT COURT*

| | |
|---|---|
| In the Matter of the Search of<br>*10410 Heritage Hills Drive,*<br>*Sand Springs, Oklahoma 74063* | )<br>)<br>)<br>)<br>) | Case No. 25-mj-787-CDC<br><br>**FILED UNDER SEAL** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the Northern District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)** | **Possession of Methamphetamine with Intent to Distribute** |

The application is based on these facts:
**See Affidavit of Wyatt Huffman, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA SA Wyatt Huffman
*Printed name and title*

Subscribed and sworn to by phone.

Date: September 18, 2025

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

In the Matter of the Search of
10410 Heritage Hills Drive, Sand
Springs, Oklahoma 74063

Case No. _____

**FILED UNDER SEAL**

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Wyatt Huffman, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search of 10410 Heritage Hills Drive, Sand Springs, Oklahoma 74063, in Osage County and within the Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, as further described in Attachment A, and for the things described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant.

3. I am a Special Agent with the Drug Enforcement Administration, United States Department of Justice, and have been so employed since July 2024. I am currently assigned to the DEA's Tulsa Resident Office.

4. Before becoming a DEA Special Agent, I completed a Bachelor of Science in Criminal Justice at Sam Houston State University in Huntsville, Texas. I also completed the DEA Academy in July 2024. During my studies at Sam Houston State University and the DEA Academy, I received instruction from professors and instructors with considerable experience investigating drug trafficking organizations globally. I have learned about different drug trafficking techniques and the methods and tactics that drug traffickers use to avoid detection and apprehension by law enforcement. During my career as a DEA Special Agent, as well as from my education, I have learned how people involved in distributing controlled substances maintain records of their distribution and conceal drug proceeds.

5. I have also received training focused on methods for unlawfully manufacturing illegal controlled substances in clandestine laboratories, installing and monitoring Global Positioning System (GPS) trackers, Title III wire interceptions, smuggling and distribution techniques, drug trafficking methods, the means that drug traffickers use to derive, launder, and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activity, and laws permitting the forfeiture of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug trafficking violations.

6. During my career as a DEA Special Agent, I have used and become knowledgeable about various investigative techniques used to investigate drug trafficking organizations, including wire and electronic interceptions and other

2

electronic surveillance methods, physical surveillance, undercover investigators and drug transactions, confidential sources and cooperating witnesses, controlled purchases of illegal controlled substances, consensually monitored recordings, trash searches, mail covers, search warrants, forensic extractions of cell phones seized from those involved in drug distribution, investigative interviews, administrative and grand jury subpoenas, and financial investigations. Through my training and experience, I have gained considerable knowledge about drug trafficking organizations and their members.

7. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, and conversations with others who have personal knowledge of the events and circumstances described herein. Because this affidavit is being submitted for the limited purpose of enabling a judicial determination of whether probable cause exists to justify the issuance of a search warrant, I have not included each and every fact known to me and others regarding the investigation of this matter. I have set forth only the facts that I believe are necessary to establish probable cause.

8. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) [Possession of Methamphetamine with Intent to Distribute] will be located at 10410 Heritage Hills Drive, Sand Springs, Oklahoma 74063, in Osage County and within

3

the Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, as further described in Attachment A.

### Jurisdiction

9. "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

10. The requested search is related to the following violations of federal law:

   a. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) – Possession of Methamphetamine with Intent to Distribute

11. Venue is proper because the person or property described in this affidavit is located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Drug Offenses Background

12.    During the course of my training and experience, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

13. Based on my background, training, and experience, as previously detailed in this affidavit, I know:

a.  Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.  Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.  Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing drug activities;

d.  Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase and transfer of controlled substances;

e.  Drug traffickers often keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where

5

drug traffickers have ready access to them, i.e., on their persons, in their vehicles, in or about their residences and places of business. These documents are often kept in code to secret their meaning from law enforcement;

f.  It is common for drug traffickers to hide contraband, proceeds of drug sales, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions, records and evidence of drug transactions relating to transferring, hiding or spending large sums of money made from engaging in drug trafficking in secure locations on their persons, within their vehicles, within or around their residences and businesses for ready access or to conceal them from law enforcement authorities;

g.  When drug traffickers collect proceeds from the sale of drugs, they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations and business frauds;

h.  Drug traffickers commonly maintain names, addresses and telephone numbers in books or papers for their associates in the trafficking organization. These books or papers include such items as address books,

6

telephone messages, etc. Shorthand and/or code names are sometimes used for buyers, co-conspirators, sellers, weights and other details of the drug traffickers;

i.  Drug traffickers hide and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that courts have recognized that unexplained wealth is derived from crimes motivated by greed, in particular, drug trafficking;

j.  The books, records, receipts, notes, ledgers, and other items mentioned above are commonly maintained where the drug traffickers have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k.  Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their products. These traffickers usually maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l.  Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing drugs. This paraphernalia includes, but is not

7

limited to, scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m. Drug traffickers frequently package illegal narcotics in vacuum sealed bags. Vacuum sealed bags help mask the smell of illegal narcotics, which assists drug traffickers with deterring law enforcement detection. Additionally, mid-level distributors frequently repackage the illegal narcotics they receive from their source of supply ("SOS") into smaller quantities.

n. Drug traffickers often keep handguns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard supplies of drugs and the proceeds of drug sales;

o. Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

p. Drug traffickers commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities;

q.  Persons engaged in drug trafficking often carry and possess firearms during and in relation to and in furtherance of their crimes. They also photograph themselves and others with controlled substances, firearms, and money proceeds. Such photographs are often kept in digital form on cell phones. Individuals involved in drug trafficking also trade images of firearms and/or other items used in or derived from their illegal activity on their cell phones;

r.  Those involved in domestic or international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications;

s.  Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

t.  Individuals involved in illegal activities like drug trafficking often generate large amounts of cash from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of financial transactions to disguise and conceal profits. Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity.

9

Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property or financial institutions.

14. Based on my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including, but not limited to, hard disk drives, floppy disks, thumb drives, compact disks, magnetic tapes, memory chips, cellular telephones, iPads and other portable electronic devices. I also know that during the search of a premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

10

b.  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.  Because of these facts, it is often necessary for computers, cellular telephones, iPads and other portable electronic devices and all related computer equipment to be seized during a premises search in order to conduct a search by Forensic Examiners in the well-equipped and controlled environment of a laboratory setting. If any electronic storage device is seized during the search of the premises described in Attachment A, a separate warrant will be sought before searching those storage devices for data.

### Probable Cause

15. On August 13, 2025, DEA investigators applied for federal search warrants targeting a residence and commercial storage locker within the Northern District of

11

Oklahoma. The warrants were sought in connection with an ongoing DEA investigation. United States Magistrate Judge Mark T. Steele of the Northern District of Oklahoma approved both search warrants on August 13, 2025.

16. While executing the search warrant at the residence on August 15, 2025, DEA investigators arrested the target of the investigation. The United States subsequently charged the target with various federal drug trafficking crimes. The target began cooperating with the United States in exchange for potential consideration related to his/her federal drug trafficking charges. However, neither the United States nor DEA investigators have promised the target any specific benefits in exchange for his/her cooperation. As of September 2025, the target is a Cooperating Defendant (hereafter, "CD-1").[1]

17. During a post-*Miranda* interview with CD-1 at the time of his/her arrest, CD-1 told DEA investigators that he/she supplies methamphetamine to a woman saved under the name "Carr 129" in CD-1's Signal chat application on his/her cell phone. CD-1 said that he/she meets "Carr 129" to sell her methamphetamine.

---

[1] CD-1's criminal history includes a prior federal conviction for drug trafficking and state charges for unlawfully carrying a weapon. However, during this investigation DEA investigators have received intelligence from CD-1 regarding Carrie Williford's involvement in methamphetamine distribution within the Northern District of Oklahoma. As described herein, investigators determined that information was reliable. Additionally, CD-1 told DEA investigators about a location in the Western District of Oklahoma where more than forty kilograms of methamphetamine were being stored. DEA investigators executed a search warrant at that location and seized more than forty kilograms of methamphetamine. Therefore, DEA investigators believe CD-1 is a reliable source of information about drug trafficking.

18. During the post-*Miranda* interview, "Carr 129" spontaneously contacted CD-1 in text via Signal on CD-1's cell phone. "Carr 129" inquired about buying three pounds of methamphetamine from CD-1 for $1,900 per pound. CD-1 showed DEA investigators the text communications and agreed to set up a meeting, under the guise of distributing three pounds of methamphetamine, with "Carr 129" in the Northern District of Oklahoma.

19. On August 15, 2025, at approximately 8:00 a.m., DEA investigators surveilled CD-1 at the meeting location he/she agreed upon with "Carr 129." During surveillance, investigators saw a silver Nissan Rogue with Oklahoma license plate ESA765 arrive to the location. After the Nissan parked, CD-1 communicated with "Carr 129" via Signal and changed the meeting location. After CD-1 sent that communication, DEA investigators saw the silver Nissan leave the first meeting location and begin driving toward the second meeting location.

20. As the Nissan drove toward the second meeting location, Tulsa County Sheriff's Deputy K. Take performed a traffic stop on the Nissan in the area of 4700 Southwest Boulevard in Tulsa, within the Northern District of Oklahoma. During the traffic stop, Deputy Take identified the sole female occupant as Carrie Williford and detained her.

21. DEA Task Force Officers J. Dawson and W. Mackenzie drove to the location where Deputy Take had detained Williford. TFO Mackenzie advised

13

Williford of her rights verbatim from a *Miranda* advisement card and Williford said she understood her rights.

22. Williford admitted to DEA investigators that she had half an ounce of methamphetamine in the Nissan's door. She told investigators that CD-1, who she identified using a nickname, was waiting for her so she could buy three pounds of methamphetamine from him/her for $1,900 per pound.  Williford said she has been purchasing approximately two pounds of methamphetamine per week from CD-1 over a two year span. Williford also told investigators that she had $7,500 in her Nissan and identified $6,500 in a blue bag for CD-1 and another $1,000 in her purse.

23. Investigators subsequently seized approximately 50.1 grams, gross weight, of methamphetamine from Williford's Nissan and field tested it. The field test yielded a presumptive positive result for methamphetamine. Investigators also located the quantities of United States currency that Williford described. also located the blue bag that contained the bulk amount of U.S. Currency.

24. Based on my training and experience, I know that three pounds of methamphetamine is consistent with distribution rather than personal use. Therefore, I believe that Williford was attempting to obtain three pounds of methamphetamine from CD-1 to distribute it.

25. On August 16, 2025, the United States charged Williford for violating 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii) [Attempted Possession of

14

Methamphetamine with Intent to Distribute] in Northern District of Oklahoma case number 25-MJ-705-MTS.

26. On August 19, 2025, Williford was released from United States Marshals Service custody and placed on pre-trial release in the Northern District of Oklahoma. Williford remains on pre-trial release at this time.

27. On September 9, 2025, DEA investigators spoke with Federal Bureau of Investigations agents regarding an FBI drug trafficking investigation in the Northern District of Oklahoma. FBI investigators advised that they executed a search warrant at a home in the Northern District of Oklahoma on August 26, 2025. During that search warrant, FBI investigators arrested the home's occupant for distribution of methamphetamine, maintaining a drug involved premises, and possession of a firearm during and in relation to a drug trafficking crime. The occupant was subsequently charged with those offenses federally and is cooperating with the FBI in exchange for potential consideration related to his/her criminal charges. Therefore, the home's occupant is now a Cooperating Defendant (hereafter "CD-2")[2].

---

[2] CD-2's criminal history includes possession of a controlled substance, driving without a license, unlawful possession of drug paraphernalia, failure to appear, second degree burglary, assault and battery with a dangerous weapon, and grand larceny. Based on the information contained herein, including the information that CD-1 provided about Williford's involvement in methamphetamine distribution, Williford's attempt to obtain three pounds of methamphetamine from CD-1, text messages between CD-2 and Williford including a photograph of Williford's driver's license, and cell phone subscriber records showing that the phone number associated with those text messages is subscribed to Williford, investigators believe CD-2's information about Williford is reliable.

28. During their conversation with DEA investigators, FBI investigators said that during a post-*Miranda* interview with CD-2 at the time of his/her arrest, CD-2 advised that a woman named "Carrie Wilson" had come to his/her home to pick up approximately seven kilograms of methamphetamine the night before the search warrant (August 25, 2025). CD-2 told FBI investigators that "Carrie Wilson's" telephone number was (918) 802-8109.

29. CD-2 consented to FBI investigators reviewing the contents of his/her cell phone. While doing so, FBI investigators saw text messages from a contact using telephone number (918) 902-8109, the number CD-2 said belonged to "Carrie Wilson." The contact was saved under the name "Carrie." While reviewing text messages between "Carrie" and CD-2, FBI investigators saw a photograph of an Oklahoma driver's license bearing Carrie Williford's name and picture. The driver's license listed 10410 Heritage Hills Drive, Sand Springs, Oklahoma, as Carrie Williford's address.

30. After receiving this information, investigators subpoenaed records from T-Mobile and determined that the telephone number (918) 902-8109, which CD-2 identified as belonging to the "Carrie Wilson" who obtained seven kilograms of methamphetamine from him/her on August 25, 2025, is subscribed to Carrie Williford at 10410 Heritage Hills Drive, Sand Springs, Oklahoma.

31. Based on the foregoing, I believe that Williford has continued to obtain distribution quantities of methamphetamine while pending prosecution in Northern

District of Oklahoma case number 25-MJ-705-MTS and while on pre-trial release. I also believe that Williford resides at 10410 Heritage Hills Drive, Sand Springs, Oklahoma, in Osage County and within the Northern District of Oklahoma, as further described in Attachment A.

### Conclusion

32. Based on the information above, I submit that there is probable cause to search 10410 Heritage Hills Drive, Sand Springs, Oklahoma, 74063, in Osage County and within the Northern District of Oklahoma, including within outbuildings and vehicles on the curtilage premises, as further described in Attachment A, and seize the items described in Attachment B.

33. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Wyatt Huffman
Special Agent
Drug Enforcement Administration

Subscribed and sworn to by phone on September __18__, 2025.

JUDGE CHRISTINE D. LITTLE
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

### Property to be Searched

The property to be searched is a residence located at 10410 Heritage Hills Drive, Sang Springs, Oklahoma 74063, Osage County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, further described as a trailer located in the 10400 block of Heritage Hills Drive, Sand Springs, Oklahoma. The trailer is the ninth structure south of Heritage Hills Drive and is located on the west side of South Briarcliff Road. The trailer is constructed of residential tan siding and a tin roof. The trailer has a white front door located on the north side of the trailer. The property to be searched is more commonly known as 10410 Heritage Mills Drive, Sand Springs, Oklahoma 74063, Osage County, and is located within the Northern District of Oklahoma and pictured below.



## ATTACHMENT B

### Description of Items to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) [Possession of Methamphetamine with Intent to Distribute], including:

a. Documents showing ownership of real or personal property;

b. United States Currency or items reflecting drug proceeds;

c. Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data.

d. Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

2

e. Items of personal property tending to establish the existence of a narcotics conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

f. Paraphernalia for distributing, packaging and weighing narcotics. Equipment and materials used in the building or using concealed compartments;

g. Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

h. Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

i. Records and items reflecting travel for the purpose of participation in drug trafficking including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

j. Any and all appointment calendars;

k. Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial

3

transactions including the purchase of real estate and documents showing ownership of real estate;

l.  Records relating to employment, wages earned and paid and other compensation records. Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

m. Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly: financial records of withdrawals, funds of transfers, purchases, sales, transfers of assets or consolidation of assets. Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

n.  Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

o.  Cellular telephones;

p.  Electronically stored data on cellular telephones or other electronic storage devices, such as PDA's or electronic organizers;

q. Electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon. Computers and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device; and

r. Firearms, ammunition and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

No seized cellular phones, storage media, or other devices containing electronically stored information will be searched without obtaining another search warrant for the data therein.